**CHOCOLATE MANUFACTURERS ASSOCIATION OF the UNITED STATES, Appellant,**

v.

**John R. BLOCK, Sec. U.S. Dept. of Agriculture; Samuel J. Cornelius, Administrator, Food and Nutrition Service and U.S. Department of Agriculture, Appellees.**

No. 83–2053.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 4, 1984.

Decided Feb. 27, 1985.

Peter Barton Hutt, Washington, D.C. (Richard A. Friedman, Laird Hart, Covington & Burling, Washington, D.C., Chris Beatley, Alexandria, Va., on brief), for appellant.

Gregory S. Walden, Dept. of Justice, Washington, D.C. (John B. Koch, Dept. of Agriculture; Richard K. Willard, Acting Asst. Atty. Gen., Carolyn B. Kuhl, Deputy Asst. Atty. Gen., Washington, D.C.; Elsie L. Munsell, U.S. Atty., Alexandria, Va.; Anthony J. Steinmeyer, Dept. of Justice, Washington, D.C., on brief), for appellees.

Before RUSSELL and SPROUSE, Circuit Judges, and HARGROVE, United States District Judge for the District of Maryland, sitting by designation.

SPROUSE, Circuit Judge:

Chocolate Manufacturers Association (CMA) appeals from the decision of the district court denying it relief from a rule promulgated by the Food and Nutrition Service (FNS) of the United States Depart-

ment of Agriculture (USDA or Department). CMA protests that part of the rule that prohibits the use of chocolate flavored milk[1] in the federally funded Special Supplemental Food Program for Women, Infants and Children (WIC Program).[2] Holding that the Department's proposed rulemaking did not provide adequate notice that the elimination of flavored milk would be considered in the rulemaking procedure, we reverse.

## I

Since 1946 USDA has administered a variety of child nutrition programs under the National School Lunch Act[3] and the Child Nutrition Act of 1966.[4] Besides the WIC Program, these programs are the National School Lunch Program,[5] the Special Milk Program for Children,[6] the School Breakfast Program,[7] the Summer Food Service Program,[8] and the Child Care Food Program.[9]

The WIC Program was established by Congress in 1972 to assist pregnant, postpartum, and breastfeeding women, infants and young children from families with inadequate income whose physical and mental health is in danger because of inadequate nutrition or health care.[10] Under the program, the Department designs food packages reflecting the different nutritional needs of women, infants, and children and provides cash grants to state or local agenices, which distribute cash or vouchers to qualifying individuals in accordance with Departmental regulations as to the type and quantity of food.

In 1975 Congress revised and extended the WIC Program through fiscal year 1978[11] and, for the first time, defined the "supplemental foods" which the program was established to provide. The term

> shall mean those foods containing nutrients known to be lacking in the diets of populations at nutritional risk and, in particular, those foods and food products containing high-quality protein, iron, calcium, vitamin A, and vitamin C.... The contents of the food package shall be made available in such a manner as to provide flexibility, taking into account medical and nutritional objectives and cultural eating patterns.

Pub.L. No. 94–105, § 17(g)(3), 89 Stat. 511, 520 (1975) (codified at 42 U.S.C. § 1786(g)(3) (1976)) (replaced by 42 U.S.C. § 1786(b)(14) (1982)).

Pursuant to this statutory definition, the Department promulgated new regulations specifying the contents of WIC Program food packages. These regulations specified that flavored milk was an acceptable substitute for fluid whole milk in the food packages for women and children, but not infants.[12] This regulation formalized the Department's practice of permitting the substitution of flavored milk, a practice observed in the WIC Program since its inception in 1973 as well as in several of the other food programs administered by the Department.

In 1978 Congress, in extending the WIC Program through fiscal year 1982, redefined the term "supplemental foods" to mean

> those foods containing nutrients determined by nutritional research to be lack-

---

1. Referred to hereafter as "flavored milk."

2. 7 C.F.R. § 246.8 (1984).

3. 42 U.S.C. §§ 1751–1769c (1982).

4. 42 U.S.C. §§ 1771–1789 (1982).

5. 7 C.F.R. § 210 (1984).

6. 7 C.F.R. § 215 (1984).

7. 7 C.F.R. § 220 (1984).

8. 7 C.F.R. § 225 (1984).

9. 7 C.F.R. § 226 (1984). Regulations promulgated by USDA affecting the conduct of these programs also appear at 7 C.F.R. §§ 245.1, 245.-2(f–1) (1984).

10. 42 U.S.C. § 1786(a) (1982).

11. Pub.L. No. 94–105, 89 Stat. 511 (1975) (codified as amended at 42 U.S.C. § 1786 (1982)).

12. 41 Fed.Reg. 1743, 1744 (1976) (codified at 7 C.F.R. § 246 and since amended).

ing in the diets of pregnant, breastfeeding, and postpartum women, infants, and children, as prescribed by the Secretary. State agencies may, with the approval of the Secretary, substitute different foods providing the nutritional equivalent of foods prescribed by the Secretary, to allow for different cultural eating patterns.

Pub.L. No. 95–627, § 17(b)(14), 92 Stat. 3603, 3613 (1978) (codified at 42 U.S.C. § 1786(b)(14) (1982)). Congress stated further:

> The Secretary shall prescribe by regulation supplemental foods to be made available in the program under this section. To the degree possible, the Secretary shall assure that the fat, sugar, and salt content of the prescribed foods is appropriate.

*Id.* at § 17(f)(12), 92 Stat. at 3616 (codified at 42 U.S.C. § 1786(f)(12) (1982)). To comply with this statutory redefinition, the Department moved to redraft its regulations specifying the WIC Program food packages. In doing so it relied upon information collected during an extensive investigative effort which had begun in 1977. In June 1977 the Department held public hearings in seven cities and elicited testimony on the structure and administration of the WIC Program. The Department invited many interested and informed parties to attend these hearings—the governor and chief health officer of every state, the House Education and Labor Committee, the Senate Select Committee on Nutrition Evaluation, state WIC coordinators, industry representatives, and professional and advocacy groups. In addition to information gathered at the public hearings, the Department received periodic reports from the National Advisory Council on Maternal, Infant, and Fetal Nutrition, as well as recommendations from a Food Package Advisory Panel convened in October 1978.

Using this information as well as its own research as a basis, the Department in November 1979 published for comment the proposed rule at issue in this case. 44 Fed.Reg. 69254 (1979). Along with the proposed rule, the Department published a preamble discussing the general purpose of the rule and acknowledging the congressional directive that the Department design food packages containing the requisite nutritional value and appropriate levels of fat, sugar, and salt. *Id.* at 69254. Discussing the issue of sugar at length, it noted, for example, that continued inclusion of high sugar cereals may be "contrary to nutrition education principles and may lead to unsound eating practices." *Id.* at 69263. It also noted that high sugar foods are more expensive than foods with lower sugar content, and that allowing them would be "inconsistent with the goal of teaching participants economical food buying patterns." *Id.*

The rule proposed a maximum sugar content specifically for authorized cereals. The preamble also contained a discussion of the sugar content in juice, but the Department did not propose to reduce the allowable amount of sugar in juice because of technical problems involved in any reduction. Neither the rule nor the preamble discussed sugar in relation to flavoring in milk. Under the proposed rule, the food packages for women and children without special dietary needs included milk that could be "flavored or unflavored." *Id.*

The notice allowed sixty days for comment and specifically invited comment on the entire scope of the proposed rules: "The public is invited to submit written comments in favor of or in objection to the proposed regulations or to make recommendations for alternatives not considered in the proposed regulations." *Id.* at 69255. Over 1,000 comments were received from state and local agencies, congressional offices, interest groups, and WIC Program participants and others. Seventy-eight commenters, mostly local WIC administrators, recommended that the agency delete flavored milk from the list of approved supplemental foods.

In promulgating the final rule, the Department, responding to these public comments, deleted flavored milk from the list, explaining:

In the previous regulations, women and children were allowed to receive flavored or unflavored milk. No change in this provision was proposed by the Department. However, 78 commenters requested the deletion of flavored milk from the food packages since flavored milk has a higher sugar content than unflavored milk. They indicated that providing flavored milk contradicts nutrition education and the Department's proposal to limit sugar in the food packages. Furthermore, flavored milk is more expensive than unflavored milk. The Department agrees with these concerns. There are significant differences in the sugar content of fluid whole milk and low fat chocolate milk. Fluid whole milk supplies 12.0 grams of carbohydrate per cup compared to 27.3 grams of carbohydrate per cup provided by low fat chocolate milk. If we assume that the major portion of carbohydrate in milk is in the form of simple sugar, fluid whole milk contains 4.9% sugar contrasted with 10.9% sugar in low fat chocolate milk. Therefore, to reinforce nutrition education, for consistency with the Department's philosophy about sugar in the food packages, and to maintain food package costs at economic levels, the Department is deleting flavored milk from the food packages for women and children. Although the deletion of flavored milk was not proposed, the comments and the Department's policy on sugar validate this change.

45 Fed.Reg. 74854, 74865–66 (1980).

After the final rule was issued, CMA petitioned the Department to reopen the rulemaking to allow it to comment, maintaining that it had been misled into believing that the deletion of flavored milk would not be considered. In a letter to CMA dated November 18, 1981, the Department indicated that it would reopen the issue of flavored milk for "further public comments" and would request "rationale both supporting and opposing the disallowance of flavored milk in the WIC Program." It subsequently reversed this position, however, and declined to reopen the rulemaking procedure.

On this appeal, CMA contends first that the Department did not provide notice that the disallowance of flavored milk would be considered, and second that the Department gave no reasoned justification for changing its position about the nutritional value of chocolate in the food distributed under its authority. The Department responds to the first contention by arguing that its notice advised the public of its general concern about high sugar content in the proposed food packages and that this should have alerted potentially interested commenters that it would consider eliminating any food with high sugar content. It also argues in effect that the inclusion of flavored milk in the proposed rule carried with it the implication that both inclusion and exclusion would be considered in the rulemaking process. Because we agree with CMA that the Department provided inadequate notice and, therefore, that it must reopen the comment period on the rule, we do not reach the issue of the reasonable justification for its change of position.

**II**

The requirement of notice and a fair opportunity to be heard is basic to administrative law. *See* 1 K. Davis, *Administrative Law Treatise* § 6.1 at 450 (2d ed. 1978). Our single chore is to determine if the Department's notice provided interested persons, including CMA, with that opportunity. We must decide whether inclusion of flavored milk in the allowable food packages under the proposed rule should have alerted interested persons that the Department might reverse its position and exclude flavored milk if adverse comments recommended its deletion from the program.

Section 4 of the Administrative Procedure Act (APA) requires that the notice in the Federal Register of a proposed rulemaking contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5

U.S.C. § 553(b)(3) (1982). The purpose of the notice-and-comment procedure is both "to allow the agency to benefit from the experience and input of the parties who file comments ... and to see to it that the agency maintains a flexible and open-minded attitude towards its own rules." *National Tour Brokers Ass'n v. United States,* 591 F.2d 896, 902 (D.C.Cir.1978). The notice-and-comment procedure encourages public participation in the administrative process and educates the agency, thereby helping to ensure informed agency decisionmaking. *Spartan Radiocasting Co. v. FCC,* 619 F.2d 314, 321 (4th Cir. 1980); *BASF Wyandotte Corp. v. Castle,* 598 F.2d 637, 642 (1st Cir.1979), *cert. denied,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784. (1980).

The Department's published notice here consisted of the proposed rule and a preamble discussing the negative effect of high sugar content in general and specifically in relation to some foods such as cereals and juices, but it did not mention high sugar content in flavored milk. The proposed rule eliminated certain foods with high sugar content but specifically authorized flavored milk as part of the permissible diet. In a discussion characterized by pointed identification of foods with high sugar content, flavored milk was conspicious by its exclusion. If after comments the agency had adopted without change the proposed rule as its final rule, there could have been no possible objection to the adequacy of notice. The public was fully notified as to what the Department considered to be a healthy and adequate diet for its target group. The final rule, however, dramatically altered the proposed rule, changing

for the first time the milk content of the diet by deleting flavored milk. The agency concedes that the elimination of flavored milk by the final rule is a complete reversal from its treatment in the proposed rule, but it explains that the reversal was caused by the comments received from 78 interested parties—primarily professional administrators of the WIC Program.

This presents then not the simple question of whether the notice of a proposed rule adequately informs the public of its intent, but rather the question of how to judge the adequacy of the notice when the proposal it describes is replaced by a final rule which reaches a conclusion exactly opposite to that proposed, on the basis of comments received from parties representing only a single view of a controversy.[13] In reviewing the propriety of such agency action, we are not constrained by the same degree of deference we afford most agency determinations. "Though our review of an agency's final decision is relatively narrow, we must be strict in reviewing an agency's compliance with procedural rules." *BASF Wyandotte Corp. v. Castle,* 598 F.2d at 641; *see also Weyerhauser Co. v. Castle,* 590 F.2d 1011, 1025–28 (D.C.Cir.1978) (whereas a court defers to an agency's technical judgments, it is less hesitant to reject the agency's interpretation of statutes, and in reviewing an agency's procedural integrity, the court relies on its own independent judgment). "The question of adequacy of notice where a proposed rule is changed after comment ... requires careful consideration on a case-by-case basis." *BASF,* 598 F.2d at 642.

 There is no question that an agency may promulgate a final rule that differs

---

**13.** In dissenting from the Supreme Court's denial of certiorari in *Eli Lilly & Co. v. Castle,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980), Justice Rehnquist noted that the case presented

> an issue of great importance, which cannot help but become greater as time goes on and more and more administrative proceedings are conducted either directly under the Administrative Procedure Act ... or similar provisions in new Acts of Congress for review of agency action. That question is the degree to which an agency, which publishes a rule for

> notice and comment under § 4 of the Administrative Procedure Act and very substantially changes the rule in response to the comments it receives, is obliged to publish the revised rule to allow another opportunity for notice and comment....
>
> ... [W]hen we consider the very significant effects that a "rulemaking" procedure may have upon the parties involved ... I think this Court should grant certiorari to examine the question.

444 U.S. at 1096–97, 100 S.Ct. at 1063–64.

in some particulars from its proposal. Otherwise the agency "can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary." *International Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 n. 51 (D.C. Cir.1973). An agency, however, does not have carte blanche to establish a rule contrary to its original proposal simply because it receives suggestions to alter it during the comment period. An interested party must have been alerted by the notice to the possibility of the changes eventually adopted from the comments. *Wagner Electric Corporation v. Volpe*, 466 F.2d 1013, 1019 (3rd Cir.1972). Although an agency, in its notice of proposed rulemaking, need not identify precisely every potential regulatory change, *Spartan Radiocasting Co.*, 619 F.2d at 321–22 (quoting *Consolidation Coal Co. v. Costle*, 604 F.2d 239, 248 (4th Cir.1979), *rev'd on other grounds sub nom. EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980), the notice must be sufficiently descriptive to provide interested parties with a fair opportunity to comment and to participate in the rulemaking. *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 758, 92 S.Ct. 1941, 1951, 32 L.Ed.2d 453 (1972); *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 392–94 (D.C.Cir.1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

■ As we have indicated, appellate review of changes in a proposed rule after comments is more specifically controlled by the circumstances of each case than most administrative appeals. Nevertheless, a review of decisions of our sister circuits performing similar tasks is helpful. In *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637 (1st Cir.1979), *cert. denied*, 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980), the court considered an EPA regulation controlling the discharge of pollutants into navigable waters by the pesticide industry. The EPA originally proposed dividing the organic pesticide industry into three subcategories, setting different pollutant standards for each one. The industry, arguing for expansion of the number of subcategories and, therefore, pollutant standards, submitted comments demonstrating that the proposed three subcategories were indistinguishable. The EPA, while agreeing with the comments, chose a different solution: it altered its initial rule by eliminating the subcategories and applying uniform standards throughout the entire organic pesticide industry. The industry complained that the EPA's decision to contract rather than expand the number of subcategories took them entirely by surprise. "The essential inquiry," the court said, "is whether the commentators have had a fair opportunity to present their views on the contents of the final plan." *Id.* at 642. The First Circuit reasoned that even if the initial rule had proposed uniform standards, the content of petitioner's comments would not have been different for they still would have argued, albeit more voluminously and vociferously, for more subcategories. *Id.* at 644. The petitioners, therefore, "had a fair opportunity to present their views." *Id.*

In *International Harvester Co. v. Ruckelshaus*, 478 F.2d 615 (D.C.Cir.1973), the court considered an EPA decision to deny applications by vehicle manufacturers for a one-year suspension of the emission standards for light-duty vehicles. The court upheld the agency's denial even though the petitioners were precluded from commenting on the methodology that the EPA had used to determine that compliance with the emission standards was technologically possible. The court based this holding on the fact that the methodology in question was developed in part on the basis of the petitioners' submissions at prior hearings. The court stated that "[t]he requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule it proposed, partly at least in response to submissions." *Id.* at 632 (footnote omitted).

■ In *South Terminal Corp. v. EPA*, 504 F.2d 646 (1st Cir.1974), the court con-

sidered an air quality transportation control plan for Boston, Massachusetts, which varied substantially from the proposal described in the notice. The petitioners contended that they had no meaningful notice of the substance of the plan. The *South Terminal* court identified two factors of primary importance in determining whether a substantially revised final rule is promulgated in accordance with the APA: the changes in the original rule must be "in character with the original scheme" and "a logical outgrowth" of the notice and comment already given. *Id.* at 658, 659; *see also BASF Wyandotte Corp. v. Costle,* 598 F.2d at 642. In rejecting the petitioners' claim, the court stated: "Although the changes were substantial, they were in character with the original scheme and were additionally foreshadowed in proposals and comments advanced during the rulemaking. [In addition, the parties] had been warned that strategies might be modified in light of their suggestions." 504 F.2d at 658. A proposed rule, therefore, must fairly apprise interested parties of the potential scope and substance of a substantially revised final rule and, under this approach, a substantial change must relate in part to the comments received.

While considering factors similar to those applied in the above cases, the Third Circuit, in *Wagner Electric Corporation v. Volpe,* 466 F.2d 1013 (3rd Cir.1972), found notice inadequate where a final rule had been substantially altered from the one described in the initial notice. The National Highway Traffic Safety Administration had published a proposed rule governing hazard warning flashers. The proposed rule would have eliminated the permissible failure rate for flashers, but it said nothing about changing the pertinent performance criteria. The final rule substantially downgraded the performance criteria for flashers. Despite the fact that several comments by manufacturers suggested downgrading the performance criteria, the court concluded that the agency's proposed rule provided inadequate notice of its final rule because it failed to apprise all interested parties of the issue of performance criteria.

*Id.* at 1019–20. In support of this conclusion, the court noted the absence of comments from groups which could be expected to oppose downgrading the performance criteria, for example, consumer groups and state highway agencies. *Id.*

The test devised by the First Circuit for determining adequacy of notice of a change in a proposed rule occurring after comments appears to us to be sound: notice is adequate if the changes in the original plan "are in character with the original scheme," and the final rule is a "logical outgrowth" of the notice and comments already given. *See, e.g., BASF Wyandotte Corp. v. Costle,* 598 F.2d 637, 642 (1st Cir.1979), *cert. denied,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980); *South Terminal Corp. v. EPA,* 504 F.2d 646, 659 (1st Cir.1974). Other circuits also have adopted some form of the "logical outgrowth" test. *See, e.g., Sierra Club v. Costle,* 657 F.2d 298, 352 (D.C.Cir.1981) (logical outgrowth of the notice and comments); *Taylor Diving & Salvage Co. v. Dept. of Labor,* 599 F.2d 622, 626 (5th Cir.1979) (logical outgrowth of the standard originally proposed). Stated differently, if the final rule materially alters the issues involved in the rulemaking or, as stated in *Rowell v. Andrus,* 631 F.2d 699, 702 n. 2 (10th Cir.1980), if the final rule "substantially departs from the terms or substance of the proposed rule," the notice is inadequate.

There can be no doubt that the final rule in the instant case was the "outgrowth" of the original rule proposed by the agency, but the question of whether the change in it was in character with the original scheme and whether it was a *"logical* outgrowth" is not easy to answer. In resolving this difficult issue, we recognize that, although helpful, verbal formulations are not omnipotent talismans, and we agree that in the final analysis each case "must turn on how well the notice that the agency gave serves the policies underlying the notice requirement." *Small Refiner Lead Phase-Down Task Force v. EPA,* 705 F.2d 506, 547 (D.C.Cir.1983). Under either view, we do

not feel that CMA was fairly treated or that the administrative rulemaking process was well served by the drastic alteration of the rule without an opportunity for CMA to be heard.

It is apparent that for many years the Department of Agriculture has permitted the use of chocolate in some form in the food distribution programs that it administers. The only time the Department has proposed to remove chocolate in any form from its programs was in April 1978 when it sought to characterize chocolate as a candy and remove it from the School Lunch Program. That proposal was withdrawn after CMA commented, supporting chocolate as a part of the diet. Chocolate flavored milk has been a permissible part of the WIC Program diet since its inception and there have been no proposals for its removal until the present controversy.

The Department sponsored commendable information-gathering proceedings prior to publishing its proposed rule. Together with its own research, the information gathered in the pre-publication information solicitations formed the basis for the proposed rule. Most of the same information was presented to Congress prior to enactment of the 1978 statute that precipitated the 1979 rulemaking here in controversy. The National Advisory Council on Maternal, Infant, and Fetal Nutrition provided information and advice. Regional council meetings were open to the public and held in diverse areas of the country. Department of Agriculture personnel attended a number of regional, state, and local meetings and gathered opinions concerning possible changes in the food packages. The agency also gathered a food package advisory panel of experts seeking their recommendations. Food packages were designed based on the information and advice gleaned from these sources. In all of these activities setting out and discussing food packages, including the proposed rule and its preamble, the Department never suggested that flavored milk be removed from the WIC Program.

The published preamble to the proposed rule consisted of twelve pages in the Federal Register discussing in detail factors that would be considered in making the final rule. Two pages were devoted to a general discussion of nutrients, including protein, iron, calcium, vitamin A, vitamin C, folic acid, zinc, and fiber, and the dangers of overconsumption of sugar, fat, and salt. The preamble discussed some foods containing these ingredients and foods posing specific problems. It did not discuss flavored milk.

In the next eight pages of the preamble, the nutrition content of food packages was discussed—under the general headings of "cereal" and "juice" for infants; and "eggs," "milk," "cheese," "peanut butter and mature dried beans and peas," "juice," "additional foods," "cereals," "iron," "sugar," "whole grain cereals," "highly fortified cereals," and "artificial flavors and colors" for women and children. The only reference to milk concerned the correct quantity to be provided to children, *i.e.*, 24 quarts per month instead of 28 quarts. Although there was considerable discussion of the sugar content of juice and cereal, there was none concerning flavored milk. Likewise, there was considerable discussion of artificial flavor and color in cereal but none concerning flavored milk. The only reference to flavored milk was in the two-page discussion of the individual food packages, which noted that the proposed rule would permit the milk to be flavored or unflavored. The proposed rule which followed the preamble expressly noted that flavored or unflavored milk was permitted in the individual food packages for women and children without special dietary needs.

█ At the time the proposed rulemaking was published, neither CMA nor the public in general could have had any indication from the history of either the WIC Program or any other food distribution programs that flavored milk was not part of the acceptable diet for women and children without special dietary needs. The discus-

sion in the preamble to the proposed rule was very detailed and identified specific foods which the agency was examining for excess sugar. This specificity, together with total silence concerning any suggestion of eliminating flavored milk, strongly indicated that flavored milk was not at issue. The proposed rule positively and unqualifiedly approved the continued use of flavored milk. Under the specific circumstances of this case, it cannot be said that the ultimate changes in the proposed rule were in character with the original scheme or a logical outgrowth of the notice. We can well accept that, in general, an approval of a practice in a proposed rule may properly alert interested parties that the practice may be disapproved in the final rule in the event of adverse comments. The total effect of the history of the use of flavored milk, the preamble discussion, and the proposed rule, however, could have led interested persons only to conclude that a change in flavored milk would not be considered. Although ultimately their comments may well have been futile, CMA and other interested persons at least should have had the opportunity to make them. We believe that there was insufficient notice that the deletion of flavored milk from the WIC Program would be considered if adverse comments were received and, therefore, that affected parties did not receive a fair opportunity to contribute to the administrative rulemaking process. That process was ill-served by the misleading or inadequate notice concerning the permissibility of chocolate flavored milk in the WIC Program and "does not serve the policy underlying the notice requirement."

The judgment of the district court is therefore reversed, and the case is remanded to the administrative agency with instructions to reopen the comment period and thereby afford interested parties a fair opportunity to comment on the proposed changes in the rule.

REVERSED AND REMANDED WITH INSTRUCTIONS.